Thank you, Your Honor. I'm Tom Burke, B-O-U-R-K-E, for Rick Schiff. And I'd like to speak for 15 minutes, Your Honor, and reserve 5 minutes for later. I think the case has been well-briefed, and to some extent I want to rely upon the briefs that have been done. But there are a couple cases out of the hundreds that have been cited by both sides that I'd like to particularly focus on. One is Nichols v. Dancer in 2011, and the other one is Imeldi v. University of Oregon. And before I launch into the facts, I wanted to say that the takeaway from Nichols v. Dancer is that the Ninth Circuit will not give carte blanche to anyone retaliating against an employee, and the Ninth Circuit will not rubber-stamp a city's asserted reasons as the basis for taking adverse actions. And both of these cases, like many of the cases we cite, are summary judgments, reversals by the Ninth Circuit. I've often been told that the best way to win on appeal is to win below. But the best way to get... That's true. The best way I know of getting a reversal on appeal is to lose below on summary judgments, because the standards are so stacked in favor of the non-moving party. And a good example of that is the Imeldi case v. University of Oregon. The cite we have is 673, Fed 3, 1218. But I do have to say that it's been republished after a petition for a rehearing was denied and a request to take it on bank was denied, and a petition for cert to the Supreme Court was denied. So you're focusing on your retaliation claim first, which is a little surprising to me, because I thought there was undisputed evidence that Chief Fong had promoted several of the officers who were involved in the initial lawsuit. Oh, yeah. I wouldn't say I'm – I would say I started the first five minutes talking about that, Your Honor. But really, it is a dual case, failure to promote and retaliation as well. And failure to promote in Shift 2, what we call the Shift 2 case, was by Heather Fong, Chief Heather Fong. The failure to promote in Shift 3, the third case, was by Chief George S. Coleman. No, I understand. But I thought you were talking about the retaliation claim in Shift 2. Are you talking about something else? I was talking about retaliation claim in both Shift 2 and Shift 3. Okay. And in Shift 2, right? Yes. If you look at people who supposedly were similarly situated, right, the other plaintiffs in Shift 1, Chief Fong did promote three of them. I think the three that she promoted were promoted off the 1999 list before she knew that they had sued. That's what I'm saying. I thought there was undisputed evidence that she – I think she stated either in her deposition or in her declaration that she did know at the time she promoted those three that they had been plaintiffs in Shift 1. I don't think that it's undisputed. We do dispute because we did – the lawsuit was not filed until after she did the promotions or the lawsuit was not served, because the lawyer that did all this before I took over from him was Pat Manshard, and he knows when that first case was served. It was not served on the city until after those promotions were made. And I think there was a strategic reason, because the people were afraid of retaliation. Am I wrong? Hang on. Hang on. Am I wrong in reading the records to suggest that Chief Fong did state under oath that at the time she made those promotion decisions, she knew that three of the plaintiffs had been – I mean, three of the officers had been plaintiffs in Shift 1? I think you're right that she said that, but you're wrong in that it was disputed. Okay.  Where's the dispute? And then also, was there an administrative precursor to that lawsuit that she may have been referring to? Pardon me? Was there an administrative precursor to the lawsuit? I don't think so. I think the – the Shift 1 lawsuit was the first thing that happened. The Shift 1 lawsuit. So where's the dispute? What's the contrary evidence? I think it was disputed in the Rick Shift declaration, Your Honor. I believe. And I end the case. What did he say? Because that's not my recollection, but what did he say? I thought what he said was that the three people promoted were promoted before she knew that there had been a lawsuit, because the lawsuit was – What's the basis for his knowledge of what she knew? Pardon me? What's the basis for his knowledge of what she knew? I think the basis for his knowledge of what she knew was the date of filing of the – the case was withheld from being served on the city until after those promotions were made. That's my understanding. But – So she could not have known. My understanding is different than the evidence in terms of what's in the record and what she said. Well, Your Honor, I don't have the Shift declaration memorized. I do have it here. It's about 30 pages. And I – if it's not in the Shift declaration, it's not there, Your Honor. If it's not in the Shift declaration – Okay. Just give me the ER site for the Shift declaration. Just the first page. The first page would be 206. Okay. 206. And one of the points we did want to point out about Imeldi, that case, on summary judgment, is that says if there's any dispute of the record, including if Judge – if Chief Fong says something, if there's any evidence, even considered to be weak evidence, you take the evidence and believe it of the nonmoving party. And I think what you're telling me is you've searched the record. You can't find anything. I'm going to go look at the Shift declaration again. I don't remember seeing anything in there that contradicted what Chief Fong said. Okay. You'll have a chance to during the city's argument if you point to a specific place you want us to look. Let me ask a different question altogether, and that is, can you find liability against the city under Monell unless – don't you have to show that the Chief was the final policymaker? That's one of the ways, but it's not the only way, Your Honor. Well, is that the primary way in which you contend the city is liable here under Monell? No. I think it's a co-equal way, Your Honor. The statute says the city is liable if there's a usage or custom, an unwritten policy. In other words, a written policy can be as pure as the driven snow. But in fact, if the real policy is bad – And what's the policy that you're relying upon? The policy we're relying upon is the use of banding and then the chief's selection of banding to pick less qualified candidates who are nonwhite. And what's the effect of the release that he signed? The effect of the release is to say there's no liability for him arising out of his nonpromotions or any adverse action prior to that release. Well, wasn't that the – wasn't that what he was releasing, the city's adoption of that policy of banding? Well, I think what he was releasing was any injury that he had already suffered up to that point by that policy of banding, because after that point, the banding is not necessarily going to give him any problems. I mean, just because a banding is adopted, as Judge Wilkins wrote in two opinions called Hoffman, just because banding is adopted doesn't mean any white person will be discriminated against. You have to have banding plus some – But the policy you're relying upon, if you're relying on a policy, is the banding policy. Is that right? Well, the policy we're relying upon is the combination of banding plus then selections of less qualified candidates, because banding is like throwing the ball up in the air, and then the actual selection is like hitting the ball. Well, when you hit the ball, is that a policy or is that just something else? It's a practice and a custom of 20 or 30 years' duration, Your Honor. And four or five or maybe even six of these examinations, what the practice was, the policy was that when it came down to make the last round of examinations, if there was a need to balance out the EEO guidelines or the need to get more people, such as Schiff. So tell me again, then, what did he release when he signed the release? He released any claim for damages for any adverse injury to him that had occurred already prior to the date of his release. So what we're asking for is that banding prior to that release can be considered as evidence, a pretext, evidence, background information, just like you can get evidence of what happened in a longstanding practice of racial discrimination if, for example, he had been a black person suing. He, I think, could put in evidence that the City of San Francisco kind of admitted to racial discriminations against blacks way back in the 70s and 80s and 90s. That's when they did that consent decree. If the problem was that the banding was illegal or the basis for a discrimination claim and he released that, I'm not sure how he can bootstrap that in. Because it wasn't banding alone was not illegal and caused him no harm necessarily. Banding was a way of setting him up for harm that would come with the use of banding to select people that were less qualified. All banding did was to make it possible to jump over him to get someone who was 10 ranks below him on these exams because what the city does is they spend hundreds of thousands of dollars to do an examination process that is really tailored to the needs of the program. So 130 people will take this exam, and you get a rank from 1 to 130. And at the beginning, the city always does rank order, the first 10 or 15 people in rank. And then in order to avoid, under the consent decree, in order to avoid past practices of racial discrimination against blacks, the city back in the 70s said we need to expand the band so that we can meet our quotas so that the black candidates that might be low down on the exam, maybe they didn't do well for whatever reason, they should be allowed to be selected. I'm just looking at the Schiff declaration, and I think your recollection is correct. It says, Chief Fong did not promote a single person off the 2005 list who was a participant in Schiff 1 and were then nonetheless within the band. And then in the next paragraph, more specifically, it says three of the Schiff 1 plaintiffs, and then they're named, were promoted to lieutenant by Chief Fong off the 99 list before she or the city were aware they'd been sued by them. Although that is not clear what the timing of that is. But your recollection, I think, is correct. Yes, Your Honor, yes. And all I can say is because I wasn't the lawyer at the time. The lawyer was Pat Manshard, who authored these briefs with me. And he told me, but maybe it's not in the record, that the reason he knows that that's true is they held it back because they were afraid of retaliation. Okay. So I'm sorry, but the passage that Judge McKeown just quoted does not establish his personal knowledge of whether Chief Fong knew at the time she made the promotions. But anyway, can I ask you a different question? Because I understand why, how you want to use the banding practice as evidence of pretext. I get that. And I don't think it's barred by the settlement agreement. But I guess my problem with your argument on that point is this. It certainly helps you establish the reasons why Chief Fong decided to pick candidate number 66 on the list, right? This is the lower-ranked black, is it lieutenant? I don't know what the ranks are. But that only gets you part of the way there, because ultimately what you have to do is show that the race-neutral reasons that Chief Fong gave for not promoting your client were pretextual. And so just the fact that she picked someone else that ranks lower doesn't carry the day for you, it seems to me. Absolutely. Precisely. And that's the point I wanted to make next. Okay. Pretext. Pretext and trumped-up charges. It's very clear, as the Dancer case says, you're not going to rubber stamp. Just because the city says that they have a legitimate reason doesn't mean you're going to accept that. You and the trial court are supposed to look into the facts. And what Mr. Schiff did was give evidence that the charges against him, the disciplinary charges, were trumped-up. And if I could just take three minutes to give your background here. You're welcome to do that. Just so you know, you've got about six and a half minutes. Okay. So if you want to watch your rebuttal time. Thank you. Thank you for the warning. Just before January of 2008, there was a meeting of the black residents in the area that Mr. Schiff worked. Okay. With the police commission. They were there. Exhibit I to his declaration is a transcript, a video transcript, of these mainly women saying, Captain Ehrlich, who's then in charge, is the greatest thing since sliced bread. He's brought community policing to him. And his chosen instrument to do this is Rick Schiff. He's the greatest guy ever. It's quoted, if you don't see the video, it's quoted in Linda Yoakum's own declaration and also in Captain Ehrlich's declaration. The great thing said about Schiff, Heather Fong was one of the audience there with the commission. Instead of thinking about that and promoting him, in January, she appointed no one else on the list from him. And then in October, no one else. Everyone other than him. But worse than that, she took Captain Ehrlich, who was doing this nurturing, fostering environment, and appointed an acting lieutenant hoping to become captain named Barrett into the park station, where she proceeded to strip his legs out from him. In his declaration, there's about three or four pages of all the things she did to take away the things he was doing to earn his stripes. And to kind of earn more of the secondary criteria. So our position is that it's not just banding. It's not just banding. I think the best evidence of our case is this evidence of trumped-up disciplinary charges, where Mrs. Yoakum did have someone, a young kid, 20 years old, not a killer or anything. He was a drug dealer associated with a gang. He made some statements to her that she did not consider serious enough to call the police about. It happened at 2.30 in the afternoon on a Friday. She had the telephone number of Captain Barrett. She had also worked with Ehrlich, the prior captain. I know all of that. All right. I know you do. But let me just at the end of the day, after your client exhausted all of his administrative appeals and whatnot, there was disciplinary action. I mean, he was found to have violated department policy. So you're saying it's all trumped up, but there was a review process and it was ultimately upheld. And I'm saying that the jury and I think this court is allowed to look beyond that, behind that, because in that review process, okay, Captain Barrett was talking about all kinds of things she did. In contrast to Schiff, she made these phone calls. And we submitted evidence to the Ninth Circuit, her telephone record, saying she could not have possibly made those telephone calls, that she lied and committed perjury in those disciplinary charges. And part of his claim is that there's a whitewash at the department of his serious charges against her, where he blinks at someone and gets failure to promote for two years. She commits lies and perjuries, and instead of doing anything against that young kid that talked to Mrs. That young kid was never even interviewed. He wasn't charged. He wasn't indicted. Nothing happened to that young kid. That kid was a relative of Mrs. Yocum. He came over the next day and apologized to her. It was no big deal. The only big deal was they were out to get Schiff, and they got him every possible way they could. So, Your Honor, I have two minutes and 45 seconds. I'd like to reserve those if I could. Thank you. Good morning, Your Honors. Lauren Munson on behalf of the City and County of San Francisco, and Chief Fong in the first matter. I believe it's 11-17291. And just the City and County of San Francisco is the only appellee in the second matter. I'd like to just start with the fact that this is not a case about discrimination, rather it's a case about a problem employee. And I think Your Honors have hit on the issue here that there is substantial evidence in the record that there were conduct problems by Sergeant Schiff. He had a conflict with his captain, and he failed to take action regarding a threat. And those were the concerns that influenced Chief Fong not promoting him in October 2008. Isn't that a factual issue that has to be sorted out at trial rather than summary judgment? No. I mean, it goes to what was Chief Fong's state of mind at the time she was making her promotional decisions. And the evidence in the record shows that she was informed of these conflicts in this conduct, and she felt that it was problematic for the lieutenant level, for the management level of the police department. How does counsel view it in a slightly different light? And I think he's almost challenging the underlying disciplinary process as opposed to Chief Fong's taking of the result of that process. Does that raise a factual issue in the way that he's presented it? No. And I hear that, and that's been kind of a theme, because Schiff doesn't have any evidence of pretext or discrimination, so he's kind of clinging to this banding, which is, you know, the city believes is barred by the statute of limitations and I can't – not the statute of limitations, I'm sorry, the settlement and release, and I can get to that later, but also his discipline. So in October 2008, discipline, the conduct that precipitated the discipline had occurred. That was the failure to report the threat. Then there was a disciplinary process that influenced, in the next Schiff 3 case, Chief Gascon's decision not to promote him. And he went – he had his due process. He went through that process, and he failed to exhaust his judicial remedies, and the discipline is what it is. It occurred. He can't now challenge it because he failed to file a writ from the police commission hearing about his discipline. So the fact that he was disciplined is undisputed. It happened. The fact that he filed that decision. Kennedy, but that doesn't necessarily mean that that was why the decision was made not to promote him. Even though he was disciplined, there – were there not other persons who had been disciplined who were promoted? I'm sorry. I just want to make sure I'm clear, because we have these two cases. Yes, we do. Are you talking about the Chief Fong's decision or Chief Gascon's decision, promotional decisions? I think I'm talking about the first one. The first one. Okay. No. I mean, in the – no. There's no evidence in the record that there were other people with recent discipline that were not promoted or recent similar judgment problems. It just makes a lot about this other police officer who allegedly had some criminal issue, and I find it a little concerning and shocking that he makes these bare allegations with no foundation. There's no evidence that that happened. There's no evidence about when this other officer that he challenges was criminally charged, whether he was disciplined, when he was disciplined. So I'm not – I don't think that's relevant for this issue. I don't think that creates an issue. Let me just – let me make sure I'm understanding what you're saying. With respect to the 2008 failure to promote – forget about shift three. Okay. With respect to that claim, you're saying that none of the other – I guess, what, there were a total of 42 people who got promoted off the 2005 list? Correct. None of those people had any disciplinary issues who got promoted. Is that your – what you're saying? Yeah. I'm not aware of any evidence that there were disciplinary issues with other – near in time, similar disciplinary issues. I'm not aware of any. Okay. Just disciplinary issues, period. Let's start with that. Are you saying that none of those 42 people had any disciplinary issues who eventually got promoted off the 2005 list? I can't say they never had any discipline. And I mean, the police department, they allow people to learn from their mistakes and grow. So there may have been people with discipline in the past, but I'm not aware of any recent discipline. I don't think – Okay. I mean, we'll ask the Plans Council on when he comes up. But can I focus you on the promotion of candidate – or whoever ranked number 66, that last person that got promoted off of the 2005 list? Because I guess I do see – I see the force of the plaintiff's argument there that the use of banding to expand the list to get down to that person could allow a reasonable jury to question whether the reasons given for not promoting his client, who ranked, I think, what, 29? I mean, well above this candidate number 66, that the reasons were protectional, that the whole point of using banding was to expand the number of minority candidates who would get promoted. And oh, wow, what a coincidence that the person – they reached down to the bottom of the list to pick number 66. Is that really just a coincidence? I can see how a plaintiff's lawyer could use that evidence very effectively at trial. So I'd like to get your response to that. Yes. Schiff makes a lot about banding. And first and foremost, the city's position is that his ability to impose liability on for any conduct known or unknown. Oh, wait. Just a moment. It doesn't use the word conduct, does it? I mean, you put that in your brief, but I couldn't – it talks about acts and causes of actions and claims, and it uses lots of words, but the word conduct is not in that release, is it? Conduct – I mean, acts or omissions. Is conduct in the release? No, but the words acts or omissions are, which are analogous to conduct. All right. Well, what did the release release, then? It fully and forever released and discharged liability against the city for any liabilities, claims, demands, acts or omissions of any kind known or unknown related to his employment from the date of signature. But he signs this in 2006, and he's saying he didn't get promoted in 2008, and he was discriminated against because of his race at that point. Why is that? He's not – that release doesn't release him from making this claim, does it? It doesn't release – it does not release him from making his intentional discrimination claim, which is related to Chief Fong's promotional decisions.  So he can bring in evidence of discrimination at that point. I don't know if it's number 66 or whether it's someone else, but one of the people who was promoted was a person by the name of Mikhail Ali. He didn't have any college. The plaintiff was a college graduate. He didn't have any gold or silver medals for valor. The plaintiff did. He didn't speak a different foreign language. The plaintiff did. He'd been a sergeant for five years, and our plaintiff had been a sergeant for 16 years. The plaintiff had been an acting lieutenant, and the other fellow, Ali, had never been an acting lieutenant. Isn't he entitled to have a jury decide whether or not the reasons that are given by the chief for not promoting the plaintiff are protectual? Isn't that a factual issue inherently? No. Why not? Let me explain to you why. First, moving on even just beyond the settlement and release, even if there was no banning, even if the certification rule was not changed and the Rule of Five, which was the original rule, stayed the same, there still would have been the ability – there's no evidence that he would have still been promoted. Chief Fong would have – there would be seven people that would not have been promoted, and one of those could have been shifted. There's no evidence that he – he's only challenging, really, these two African Americans that were promoted, one who ranked higher than him. And Chief Fong testified that, I ran out of appointments. I couldn't appoint anyone else. I never skipped over Sergeant Schiff in January 2008. I never got to him. Although he could have been promoted, but she was able to fill the number of positions with qualified people before she got to him. Then in October 2008, that's when she did skip over him. But at that point, there were some – there were serious concerns that she had about his conduct, his judgment, the conflicts with his supervisor, and that is what influenced Chief Fong's decision not to promote him. And just one final thing. He's provided – yes, he's compared his resume with these – only these two people, no one else who also was promoted beyond him that he was skipped over for. He doesn't explain why any of the other people in between would not have been promoted. But if these – Do you need more than one? In other words, if there's two people up for promotion and there is a basis for retaliation and the Chief chooses one over him, he'd have a retaliation case, wouldn't he? If he had a basis for retaliation. So he only needs one. He doesn't need, like, a bundle, right? No, but he's not – you have the pieces of paper that he's compared side to side, but he's leaving – conveniently leaving aside the fact that there were performance problems. He – So does it boil down to then how to evaluate the pretext evidence where she says that the reason was because by then he has the discipline issue and that's the reason, and Mr. Schiff says, well, that's just pretext. I think it's because she wants to keep promoting, you know, by virtue of race. So is there a factual issue then when you have those two colliding explanations? I don't believe so, because Schiff has provided no evidence of pretext other than he doesn't agree with what Chief Fong's explanation is, and I don't believe that's enough. And I'd also just like to add that on the prior list that expired, the one that involved the prior lawsuit that was settled, Chief Fong made several promotions off that list, and none of them were African-American. Well, isn't it a fact that when – before Barrett had accused Schiff of the five disciplinary violations, which all occurred, I think, on the same day, he'd never been disciplined for anything, and then all of a sudden on one day, which I think was the day before the 2005 list was to expire, all of a sudden there are five violations claimed, one of which is ultimately sustained. But doesn't that give pause for thought as to, well, what's going on here? Are they really after this person? Because, I mean, he's got a retaliation claim. He says he filed this lawsuit, and now all of a sudden they're trumping up all these charges. Is he entitled to have a stay in court on that? You know, he's failed to explain how Captain Barrett – I mean, he has this elaborate conspiracy theory about everyone's out to get him because he was so successful in this prior lawsuit. Well, there's no evidence he was successful. Yes, he settled it along with other plaintiffs. He filed the lawsuit in 2003. There's no evidence that Captain Barrett was aware of the specifics of that lawsuit. She wasn't involved in the settlement. I don't – there's no – you know, he has to make that causal connection, and he hasn't done it. He's just taken facts and fed them into his – this conspiracy theory to try and get him past summary judgment. But he can't – he needs more than speculative conjecture. He needs evidence, and he doesn't have that. The trial court ruled, I think, that a banding issue had been released, and so it couldn't be considered at all. Isn't it a fact that the Ninth Circuit has ruled that even – that you can – even if it predates the period of time that's in question, that you can take that into account in determining whether or not there's been intentional discrimination? I would agree with that in a case that has to do with the statute of limitations. I think it's clear that background evidence can be used. The statute of limitations for a 1981 claim, your brief says 2 years, but that's not right, is it? For failure to promote, I believe it's 2 years. And for this particular failure to – One claim is a 4-year statute, is it not? For pre – claims that would have existed pre-1991, I believe it's a 2 years. And I think Patterson explains that a failure to promote when it has change in job responsibilities as well as a change in pay would be akin to a new contractual relationship. Even whether it's 2 or 4, I think it's 4, but the – he brought his claim in time, did he not, in connection with his failure to promote in 2008 claim? Yeah, I'm sorry. The statute of limitations is really not an issue, is it? No. And I think it's more the release. And what I wanted to finish up with in answering your question, Your Honor, was that in the cases that say background evidence may be used, that they don't contemplate that there was a settlement and release of all claims and acts or omissions or liabilities prior to the signature. And so I think that's the distinction here. I understand that, Your Honor. What if you have – I mean, if you have a release of actual claims that existed as of that point in time, that's pretty understandable. But if there's some aspect of the underlying system that continues afterwards, then why wouldn't you be able to show that you might have released all your claims from before now, but structurally some of the hazards still exist and that you're subject to those being the banding? I think this is a red herring, this issue. I don't think it goes to the underlying issue. I think he still wouldn't necessarily have been promoted. If there was – the same outcome would have happened. He wouldn't have been promoted, regardless if there was banding or there wasn't. So what does he need to show, then, in terms of his retaliation claim? What, in your view, would he need to show to get past the summary judgment? For his retaliation? Yes. That there was some causal connection between his prior protected activity, which was his 2000 – if we're talking about the 2003 lawsuit. Yeah, the 2003 lawsuit. And this – Qi Feng's decision not to promote him in October 2008. I mean, five years, I don't see it. He – and he has provided no other evidence other than – he's provided nothing other than these conspiracy theories that we've talked about and then, you know, the fact that the settlement check was cut on a certain date, which – I'm sorry, a settlement check being cut is not protected activity and there's no – Do we have cases that have that kind of a break in them, where we've said there was a factual issue after a period of five years or no? I haven't found any after five years. He hadn't even been paid, had he, on the settlement? That was still pending at the time he was denied his promotion in 2008. Isn't that right? Well, I believe so, but there were other issues that are not part of this case regarding the settlement. They were outside of the scope of Qi Feng.  She doesn't write the check herself. So your – I gather your contention is that – well, do you agree he makes at least a prima facie case and you rebut it, and now he's got to produce some evidence – produce some evidence only to survive summary judgment on both the intentional discrimination and the retaliation claim? I don't think he's shown the causal connection, and I think that's part of the prima facie case. So he doesn't make a prima facie case, in your opinion? Not either? No. Well, what does he have to do to make a prima facie case? I mean, if you're – He's got to engage in some protective activity, and he's – My understanding, and I could be misremembering the law, but the causal connection piece is part of the prima facie case, and I just don't see it on the retaliation or the discrimination. Well, he certainly made out a prima facie case as to the discrimination claim. I think you'd have to concede that. The real question is whether Qi Feng's race-neutral reasons were protectural, and maybe I can just bring you back to the question I posed before. You didn't quite get a chance to answer it, I don't think. Why – put aside the settlement, because as I said, I'm not persuaded by that. Why couldn't he use the evidence that banding was used to expand the list precisely so that more minority candidates could qualify? Why can't he use that as evidence at the pretext stage on the discrimination claim? Well, there's two – it's two distinct decisions. You have the decision to make the certification rule, which was not – did not involve Qi Feng. It was independent of her. Right. There's no evidence that it was a race-based decision. Wait. Wait, wait. Okay. That's – so you're saying that the decision to use banding had nothing to do with race? There's no evidence of that. I don't know, standing here today. Well, the district court found against you on precisely that point, and I'm just – that's why I'm asking. Are you contesting that? Do you think there was some other completely race-neutral reason as to why banding was implemented? Well, it was – if you read the rule, it has to do with adverse impact under Title VII, which could be things other than race. And I don't think there's any evidence in the record that it was – that the rule was changed for a race-based reason. It could have been a gender-based reason, a national origin reason. But, I mean, I – it was changed. I can't – you know, there was – the civil service commission decided there was some kind of adverse impact, and they changed the certification rule. Let's say that we agree with the district court, or at least we don't find a basis to reverse the district court's ruling that the reason for using banding in this instance was race-based. Okay? Why can't he then use at the pretext stage that evidence to support his claim that it's not a coincidence that they reached all the way down to pick number 66 over me? Well, there's no connection between the civil service's decision to change the certification rule and Chief Fong's promotional decisions three years later. There's absolutely no connection. They're two different decision makers. She was using – you know, following the rule that was provided to her by the civil service commission and giving her the parameters of who she can promote, and then using – you know, relying on the secondary criteria, the needs of the department, and her own discretion in making these decisions. And there's absolutely no evidence that she had some discriminatory intent in the decisions that she made, or evidence that she had – in the past had discriminatory intent in the decisions she made. And I noted that in the prior list, the promotions that she made did not include a single African-American. So why now would she decide to – and she didn't promote every African-American which she could have from this list. She didn't. So from the 2005 list. I don't see that as evidence that she had some race-based intent. And then you just look at the numbers of the number of Caucasians that were promoted. 71 percent of the promotions were Caucasians. How is that an inference of discrimination? So I think they're two very distinct decisions with very distinct people involved. And I don't think you can tie a decision by some other body to a chief Fong. And there's no evidence that they were related in any way. Thank you. We have a couple minutes for rebuttal. Mr. Court. Thank you, Your Honor. It's a pleasure to be before such a hot bench that knows the record and the law so well. I did want to focus just on three points, two of which relate to Imeldi. Imeldi, like every single pretext case, was a case where the decision-maker submitted a declaration saying, these are my reasons. I'm not kidding. And the Ninth Circuit held, and I think the most recent case that's been cited to you in all of the briefs, is that just because a decision-maker says that, there can be other evidence to overcome that. Even though the decision-maker is in the best possible place to decide on his own state of mind, because no one can give better testimony. But there can be weak testimony or inferences that if there is any testimony in contrary to that decision-maker's state of mind testimony, then there's no room for summary judgment. That's what Imeldi held over a very strong dissent saying, hey, this evidence is weak. We're familiar with Imeldi. Let me just ask you, I know you've got two other points, but of the 42 people who were promoted off the 2005 list, can you name one who had disciplinary issues? That would be very helpful for your case, and I'm just waiting to write it down. Okay. That would be great, and I have a different citation. I have a different one, but I think it's the best in the world. Okay. And if I had the number, I'd give it to you. But I know the fact, and I know it's stated. Chief Fong, in her deposition, which I took, said that it was her practice to only to use discipline when the matter had been sustained. In other words, her practice was, if some disciplinary thing has been sustained, that's when I do it. With Rick Schiff, it was not only not sustained, it had been rushed into the last minute, these five charges put in at the last second. But the answer to Judge Whiteford's question is that you don't have such a practice. Yes. That is the answer to his question. Well, one of these claims was sustained, was it not? Yes, it was, Your Honor. Yes, one of it was sustained. But what a ---- Did he take no appeal from that, no writ from that, no further proceeding? He appealed it pretty high. I think he could have done one more step or something. But it was sustained? Yes, it was. Okay. It was sustained. Somebody wanted him to have a three-day suspension, stayed for a year, and then reduced it down to one-day suspension, stayed for a year, and a transfer into a less sexy station, you know. And the other thing, those are the two other three points I wanted to make.   Thank you. We have no time left. So why don't you make your final point for us. The final point was Emelde also says that some evidence of pretext is if there is a race-based animus in the record. And I would direct you to the declaration of Rick Bruce, a former deputy chief, who has testimony about race-based decisions being made by Heather Fong and the prior chief. Thank you. Thank you. Thank both counsel for your argument this morning. The dual cases of Schiff v. Sicilian County of San Francisco are submitted.
judges: Zilly, McKeown, Watford